# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

SAM AUCTION SOFTWARE,
LLC, *et al.*,

        Plaintiffs,

v.

INTERNATIONAL AUCTION
PARTNERS, INC.,

        Defendant.

Case No. 2:19-cv-798
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Kimberly A. Jolson

## OPINION AND ORDER

Currently pending before the Court is Defendant International Auction Partners, Inc., d/b/a Bidsquare's ("Bidsquare" or "Defendant") Motion for Partial Judgment on the Pleadings (ECF No. 6). Plaintiffs SAM Auction Software LLC and Bidpath, Incorporated, d/b/a SAM Auction Software (collectively "Plaintiffs" or "SAM") have responded (ECF No. 14), and Defendant replied (ECF No. 15). Accordingly, this matter is ripe for review. For the reasons stated herein, Defendant's Motion for Partial Judgment on the Pleadings (ECF No. 6) is **GRANTED**.

### I.

On December 13, 2013, SAM and International Auction Partners, Inc. ("IAP"), a predecessor of Bidsquare, entered into the Software Platform Service Agreement (the "Service Agreement). (Compl. ¶ 9 [ECF No. 1]). The Service Agreement initially was for a one-year term, through December 31, 2014, and automatically renewed for additional one-year terms, through December 31, 2018. (Compl. ¶ 12). Pursuant to the Service Agreement, Defendant was to pay Plaintiffs $5,000 per month for hosting the Online Venue Platform, as well as an additional fee for every auction that Bidsquare, or its predecessor, listed on the Online Venue Platform. (Fee

Schedule [ECF No. 1-1, Ex. B, PAGEID # 14]).  During this time, Bidsquare used the SAM online venue platform to conduct online auctions.  (Compl. ¶ 9).  By May 1, 2018, however, Bidsquare stopped using SAM's online venue platform and began to conduct its auction business on another platform service provider.  (*Id.* ¶ 12).  And on October 30, 2018, Defendant terminated the agreement, per the terms of the Service Agreement.  (*Id.* ¶ 15).

Plaintiffs allege that Defendant materially breached the Service Agreement in two ways: 1) Defendant failed to pay the $5,000 per month service fee from June 2018 through December 2018; and 2) Defendant neglected to pay the "per auction" fees owed to Plaintiffs under the Service Agreement for auctions that Bidsquare conducted on other platforms from May 1, 2018 through December 31, 2018, totaling approximately $181,000.  (Compl. ¶¶ 12–14, 17–20).

Plaintiff commenced this action on March 6, 2019, with the filing of a two-count Complaint against IAP for: 1) breach of written contract; and 2) "Money Owed on Account Against IAP". (*See generally* Compl.).  Defendant has moved for partial judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedures, asserting that Plaintiffs cannot, as a matter of law, collect the "per auction" fees for auctions conducted on other platforms.  (*See generally* Mot. for on Pld. [ECF No. 6]).  Plaintiff opposes Defendant's Motion, asserting that the parties' agreement implies exclusivity.  (*See* Pl. Opp'n at 2–3 [ECF No. 14]).  Defendant replied.  (*See generally* Reply [ECF No. 15]).  Accordingly, this matter is fully briefed and ripe for disposition.

## II.

The Court reviews a Rule 12(c) motion for judgment on the pleadings in the same manner it would review a motion made under Federal Rule of Civil Procedure 12(b)(6).  *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 761 (6th Cir. 2006).  Rule 12(b)(6) provides for dismissal of actions that fail to state a claim upon which relief can be granted.  Generally, an action will be

dismissed under this standard where "there is no law to support the claims they made." *Stew Farm, Ltd. v. Nat. Res. Conservation Serv.*, 967 F. Supp. 2d 1164, 1169 (S.D. Ohio 2013) (citing *Ranch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 702 (6th Cir. 1978)). The same holds where "the facts alleged are insufficient to state a claim." *Id.* Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *See also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To meet this standard, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (clarifying the plausibility standard articulated in *Twombly*).

Several considerations inform whether a complaint meets the facial-plausibility standard. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Further, the factual allegations of a pleading "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. A complaint will not, however, "suffice if it tenders 'naked assertion[s] devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 555 U.S. at 557). Courts must construe the claim at issue in the light most favorable to the non-moving party, accept all factual allegations as true, and make reasonable inferences in favor of the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008).

### III.

Defendant moves for partial judgment on the pleadings and asserts that, as a matter of law, Plaintiffs are not entitled to the amount of damages they seek for the alleged breach of contract. (*See* Mot. for J. on Pld. at 1). Defendant submits that the plain language of the fully integrated

contract forecloses the Plaintiffs from collecting the approximately $181,000 "per-auction" fees they seek to collect, as neither the Service Agreement or the related License Agreement contain an exclusivity clause. (*See id.* at 6).

In diversity cases, a federal court is to apply the law of the forum state. *See Poplar Creek Dev. Co. v. Chesapeake Appalachia, LLC*, 636 F.3d 235, 240 (6th Cir. 2011) (citations omitted). To succeed on a breach of contract claim in Ohio, a plaintiff must demonstrate: 1) the existence of a contract; 2) performance by the plaintiff; 3) breach by the defendant; and 4) damages. *See Bonds v. Univ. of Cincinnati Med. Ctr.*, No. 18-3509, __ F. App'x __, 2019 WL 2323905, at *3 (6th Cir. Feb. 6, 2019) (citing *Garofalo v. Chicago Title Ins. Co.*, 104 Ohio App. 3d 95, 108, 661 N.E.2d 218 (Ohio App. May 23, 1995) ("Generally, a breach of contract occurs when a party demonstrates the existence of a binding contract or agreement; the nonbreaching party performed its contractual obligations; the other party failed to fulfill its contractual obligations without legal excuse; and the nonbreaching party suffered damages as a result of the breach.")).

The only element currently disputed is the damages element. Plaintiff seeks to collect two forms of damages: 1) the monthly recurring flat fee; and 2) the variable fee for each auction held. (Compl. at ¶¶ 20, 23). Defendant, however, asserts that under the plain and unambiguous terms of the fully integrated contract, Plaintiffs are not entitled to the "per auction" fees for auctions conducted on other hosting platforms as the contract is silent on the issue of exclusivity. (*See generally* Mot. for J. on Pld.). Plaintiffs disagree and assert that certain terms of the contract are ambiguous and, when read in light most favorable to the Plaintiffs, support the conclusion that IAP contracted to exclusively use SAM to host online auctions. (*See* Pl. Opp'n at 3).

"Under Ohio law, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court."

4

*Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (citing *Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993) (applying Ohio law); *Potti v. Duramed Pharm., Inc.*, 938 F.2d 641, 647 (6th Cir. 1991) (same)). "The role of courts in examining contracts is to ascertain the intent of the parties." *City of St. Marys v. Agulaize Cty. Bd. of Comm'rs*, 2007-Ohio-5026, at ¶ 18, 875 N.E.2d 561 (Ohio 2007) (citing *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St. 3d 270, 714 N.E.2d 898 (Ohio 1999)). "The intent of the parties is presumed to reside in the language they choose to use in their agreement." *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 313, 667 N.E.2d 949 (Ohio 1996). "Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract." *City of St. Marys*, 2007-Ohio-5026, at ¶ 18. But "[e]xtrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning." *Graham*, 76 Ohio St. 3d at 313–14 (citing *Shifrin v. Forest City Enters., Inc.*, 64 Ohio St. 3d 635, 638, 597 N.E.2d 499 (Ohio 1992)).

A contract's language is ambiguous "only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Covington v. Lucia*, 151 Ohio App. 3d 409, 414, 784 N.E.2d 186 (Ohio App. Jan. 23, 2008) (quoting *Potti*, 938 F.2d at 647) (internal quotation omitted). "[C]ourts may not use extrinsic evidence to create an ambiguity; rather, the ambiguity must be patent, i.e., apparent on the face of the contract." *Id.* (citing *Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996)). When determining whether a contract's language is ambiguous, a court is to consider the entirety of the contract so to "give reasonable effect to every provision in the agreement." *Stone v. Nat'l City Bank*, 106 Ohio App. 3d 212, 221, 665 N.E.2d 746 (Ohio App. Sept. 5, 1995); *see also Tri-State Grp., Inc. v. Ohio Edison Co.*, 151 Ohio App. 3d 1, 9, 782 N.E.2d

1240 (Ohio App. Dec. 26, 2002). Common words in the contract "are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St. 2d 241, 245–46, 374 N.E.2d 146 (Ohio 1978). And if a "contract is silent, as opposed to ambiguous, with respect to a particular matter, . . . 'it is not the function of courts in Ohio to formulate a new contract for the parties.'" *Savedoff*, 524 F.3d at 764 (citing *Stalter Arms, Inc. v. APCOA, Inc.*, 700 NE.2d 415, 421 (Ohio Ct. of Common Pleas Oct. 17, 1997); *Fultz & Thatcher v. Burrows Grp. Corp.*, No. CA2005-11-126, 2006 WL 3833971, at *6 (Ohio App. Dec. 28, 2006)) (internal citations omitted).

Defendant avers that the contract is silent on the issue of exclusivity and that "[n]either the Service Agreement nor the License Agreement contain any language suggesting that [Plaintiffs are] entitled to auction fees for auctions not listed on [Plaintiffs'] platform." (Mot. for J. on Pld. at 7). In Defendant's view, the agreement "contemplates the exact opposite." (*Id.*). Defendant points out that the Service Agreement "lists the fees for various types of auctions[ and] states that it 'sets forth the fees to be charged by SAM to IAP *for services provided* under this agreement.'" (*Id.*) (emphasis in original).

Plaintiffs disagree. Plaintiffs do not appear to dispute that neither the Service Agreement nor the License Agreement contain an explicit exclusivity clause. (*See* Pl. Opp'n at 6) ("A contract need not expressly state that it is an exclusive contract for it to be one."). Rather, Plaintiffs assert that the agreements implicitly require Defendant to exclusively use Plaintiffs' auction platform, as Plaintiffs aver: "There is language in the Agreements that not only suggests but compels a conclusion that the parties intended that Bidsquare be required to exclusively use the SAM online venue platform throughout the duration of the Service Agreement." (Pl. Opp'n at 6). Plaintiffs

draw the Court's attention to provisions of the Service Agreement and the related License Agreement that they purport either demonstrate the parties' intent that Defendant exclusively use Plaintiffs' online auction platform or, alternatively, create ambiguity:

> (1) the language describing the overall purpose of the Service Agreement, which reflects that Bidsquare intended to use the SAM online venue platform for *all* (not just some) of its clients (page 1 of the Service Agreement) [the "Whereas Clauses"];
>
> (2) the termination provisions requirement that SAM cooperate with any "replacement provider" upon "termination," which expressly indicates that SAM was intended to be the sole provider throughout the term of the agreement (page 1 of the Service Agreement) [the "Termination Provision"]
>
> (3) the fee provision, which indicates that SAM would be paid for "each" (meaning "all") auctions, not just some auctions (page 1 of the Service Agreement) [the "Fee Provision"]; and
>
> (4) the obligation under Section 2.2 of the License Agreement that SAM was required to conduct software updates during the period that the Service Agreement was in effect, which indicates that the parties contemplated that Bidsquare would exclusively use the SAM online venue platform throughout the term of the Service Agreement.

(Pl. Opp'n at 3). In reply, Defendant asserts that "Plaintiffs' strained interpretation of the parties' contracts stretches their language far past the breaking point." (Reply at 1). Defendant further submits that the provisions upon which Plaintiffs rely do not imply exclusivity. (*Id.* at 2). The Court shall address each of these clauses in turn.

### A. Service Agreement's Whereas Clauses

Contained on the first page of the Service Agreement is the following language:

> WHEREAS, SAM has designed an Online Venue Platform (the "Site") for the sale of property via online and live auction internet sales for IAP;
>
> WHEREAS, IAP specializes in offering auction companies ("Customers") a portal to advertise the sale of their owned or consigned property that is being sold pursuant to applicable state law;

7

> WHEREAS, IAP desires to broadcast online and live auction internet sales for Customers using the SAM auction platform.

(Service Agreement at 1). Plaintiffs, relying on the third Whereas clause, assert: "This language reflects the understanding that Bidsquare intended to use the SAM auction platform exclusively, *i.e.* that it intended to broadcast online and live internet auctions for its 'Customers' (not just some of its Customers) 'using' the SAM auction platform." (Pl. Opp'n at 6–7). Defendant submits that "[t]he only meaning that can be derived from the third recital is exactly what it says: Bidsquare's predecessor wished to use the Online Venue Platform to broadcast auctions for its Customers." (Reply at 4).

The language of the Whereas Clauses cannot reasonably be construed to imply that the parties intended exclusivity. The Court agrees with Defendant, the third Whereas Clause simply means what it says: "Bidsquare's predecessor wished to use the Online Venue Platform to broadcast auctions for its customers." (Reply at 4). A reading of exclusivity into this clause would stretch the parties' chosen language beyond reason.

**B.  Service Agreement's Termination Provision**

The Termination Provision is as follows:

**TERMINATION**

> Either party may terminate this agreement within 30 days of its expiration for any reason by giving written notice to the other. Lacking such notice, this Agreement shall renew on an annual basis until terminated. However, IAP shall be entitled to immediately terminate upon the failure of SAM to provide the services contracted for herein and the inability to cure said failure within 30 days of written notice from IAP. SAM shall be entitled to immediately terminate upon breach of contract by IAP or the failure of IAP to pay for SAM's services as provided for under this Agreement and the inability to cure said failure within 30 days of written notice from SAM.
>
> Upon termination, SAM agrees to assist IAP with the immediate and full transition of data, information, and know-how to any replacement provider for IAP and agrees

not to unreasonably withhold said data, information, and know-how. SAM's time and materials rate of $150 will apply to any such transition work.

(Service Agreement at 1). Plaintiffs assert: "This provision's reference to 'upon termination' and 'any replacement provider for IAP' clearly indicates that SAM was intended to be the sole provider *until termination*, at which point SAM could be *replaced*." (Pl. Opp'n at 7). Plaintiff continues that a reasonable and natural understanding of the term "replacement provider" is "a provider that would be a substitute, a successor, or one that takes the place of SAM. In other words, there would be one provider, SAM, until *upon termination of the contract* SAM would then be substituted by a replacement provider." (*Id.*) (footnote omitted). Thus, Plaintiffs argue, "[p]er the terms of the Service Agreement, SAM was to be the sole provider to Bidsquare until the Agreement was properly terminated (and that was done as of January 1, 2019) and then SAM would assist in the transition to the replacement provider." (*Id.* at 8).

Defendant, however, avers that the Termination Provision "simply means what it says: SAM agreed to cooperate in transitioning Bidsquare's predecessor to any other platform upon termination." (Reply at 5). Defendant also argues that Plaintiffs ignore the word "any" before "replacement provider[,]" which "indicates the parties' understanding that Bidsquare's predecessor could be using multiple platforms at the same time to list its auctions, any one of which SAM would be obligated to assist in the transition to." (*Id.*) (citing *EnQuip Techs. Grp. Inc. v. Tycon Technoglass S.R.1*, 986 N.E.2d 469, 2012-Ohio-6181, ¶ 16 (Ohio Ct. App. Dec. 28, 2012)). Defendant further states that had the parties intended exclusivity, "they certainly would not have hidden such a significant provision within a completely unrelated clause like this one." (*Id.*) (citing *Newport Yacht Club v. City of Bellevue*, No. C09-0589, 2009 WL 10676443, at *1 (W.D. Wash. Aug. 7, 2009)).

9

The Court again agrees with Defendant. While Plaintiffs correctly point out that the reasonable understanding of a "replacement provider" is one that would be a substitute or successor, it does not reasonably follow that the Termination Provision demonstrates that Plaintiffs would be the sole provider. Again, Defendant is correct that the Termination Provision "simply means what it says" that, when the agreements are terminated, Plaintiffs were required to transfer the data to any replacement provider.

C.  **Service Agreement's Fee Provision**

The Fee Provision states:

### FEES FOR "ONLINE AND LIVE" AUCTIONS

IAP agrees to pay SAM in accordance with the fee schedule outlined below in Exhibit B for the term ending December 31, 2014. Invoices will be generated after each auction and is payable by wire within seven (7) calendar days after the end of the auction. Any disputes concerning billing must be made within 30 days after the end of the auction. For any term beyond December 31, 2014, SAM shall submit any changes in said fee schedule at least ninety (90) days prior to beginning of next term. Unless otherwise agreed by the Parties in writing at the time of the change, failure to submit changes in the fee schedule at least ninety (90) days before beginning of the new term results in maintaining the fee schedule of the current term for the duration of the next term.

(Service Agreement at 1). Plaintiff submits that "the language of this provision indicates that SAM was to be paid for *all* auctions, not just *some* auctions[,]" and Plaintiff asserts that "'each' is synonymous with 'all.'" (Pl. Opp'n at 8). Thus, Plaintiffs aver that this language "indicates that SAM was to be paid for *all* auctions, not just *some* auctions[]" and further "this language contemplates that all auctions would use the SAM online platform, *i.e.*, an exclusive arrangement." (*Id.*).

Defendant disagrees. Defendant asserts that "regardless of how the term 'each' is defined, it is used in the context of describing SAM's obligations with respect to the generation of invoices, not Bidsquare's obligation with respect to usage of the Online Venue Platform." (Reply at 6).

10

Further, Defendant draws the Court's attention to the fee schedule, which is attached as Exhibit B to the Service Agreement, which "sets forth the fees to be charged by SAM to IAP for services provided under this agreement." (*Id.*) (quoting Fee Schedule) (internal quotations omitted). In full, the Fee Schedule is as follows:

Exhibit B – Fee Schedule

THE FOLLOWING SETS FORTH THE FEES TO BE CHARGED BY SAM TO IAP FOR SERVICES PROVIDED UNDER THIS AGREEMENT.

| | |
|---|---|
| Cost / white label deployment | $3,750 |
| Hosting | $5,000 / mo. |
| Cost / auction (live) | $500 |
| Streaming A/V | $100 |
| Cost / auction (online-timed) | $350 |
| Content Only Auction | $175 |

(Fee Schedule). As such, Defendant avers "this language plainly contemplates that auction fees will be charged only with respect to auctions for which SAM provides services (*i.e.*, auctions conducted on the Online Venue Platform)." (*Id.*) (citing Mot. for on Pld. At 5–6). This language, Defendant submits, "only further confirms that judgment on the pleadings as to Plaintiffs' claim for auction fees is appropriate." (*Id.* at 7).

The Service Agreement's Fee Provision is unambiguous and does not imply exclusivity. While Plaintiffs' correctly point out that "each" is synonymous with "any," here "each" cannot be

11

read out of context. The first sentence of the Fee Provision provides such context: "IAP agrees to pay SAM in accordance with the fee schedule . . . ." (Service Agreement at 1). And, as Defendant submits, the Fee Schedule designates "the fees to be charged by SAM to IAP for services provided under this agreement." The "services provided" under the agreements are those services that Plaintiffs actually provided to Defendant, not services that a third party provided to Defendant. As such, Plaintiffs' argument that the Fee Provision implies exclusivity is unpersuasive.

**D.  Section 2.2 of the License Agreement**

Section 2.2 of the License Agreement is as follows:

> Future Software Updates. Additionally, SAM hereby grants to IAP, its successors and assigns, a non-exclusive, unrevokable, perpetual license to all Intellectual Property Rights related to the Future Software Updates created for IAP related to the use, maintenance, and updating of the Online Venue Platform including the rights to use, copy, and create derivative works for the source code, object code, and user interfaces that SAM uses to update the Online Venue Platform. SAM agrees to execute any documents that IAP reasonably requests to memorialize this transaction. The licensing occurs upon implementation of the Future Software Updates into the Online Venue Platform, or other system utilized by IAP for providing similar functionality. The agreed price set forth in Exhibit B also includes the obligations of this paragraph. Future Software Updates authored by IAP or its agents must be submitted to and reviewed by SAM development staff before being included in the supported and licensed Online Venue Platform source code. Future Software Updates by SAM are required during any period that an annual "Software Platform Agreement" is in effect between IAP and SAM.

(License Agreement § 2.2). Plaintiffs focus on the last sentence in support of their assertion that Defendant was to exclusively use Plaintiffs' Online Auction Platform. Plaintiffs assert: "by requiring SAM to conduct future software updates during the period the Service Agreement is in effect further demonstrates that the parties contemplated Bidsquare would exclusively use the SAM online venue platform throughout the duration of the Service Agreement." (Pl. Opp'n at 8–9). Defendant again disagrees that this section of the License Agreement contemplates exclusivity. (*See* Reply at 7–8). The Court agrees with Defendant. This provision of the contract is silent on

the matter of exclusivity and Plaintiffs' assertion that a provision requiring an online platform to provide its customers with software updates during the contractual period implies exclusivity is not well taken. Rather, this provision merely means what it says, that SAM and its predecessor were required to provide IAP and its predecessor with software updates during any period that the contract is in effect.

### E.     Lack of Language Negating a Reading of Exclusivity

Plaintiffs finally assert that "it must be recognized [that] there is no provision in the Service Agreement (or the related License Agreement) that negates exclusivity." (Pl. Opp'n at 9). But while that may be, Plaintiffs have similarly failed to direct the Court to language in the contract that implies exclusivity and it is outside the purview of the Court to rewrite the parties' contract if the "contract is silent, as opposed to ambiguous, with respect to a particular matter[.]" *Savedoff*, 524 F.3d at 764. Since exclusivity is not a rebuttable presumption, this argument lacks merit.

### IV.

For the reasons stated herein, Defendant's Motion for Partial Judgment on the Pleadings (ECF No. 6) is **GRANTED**.

**IT IS SO ORDERED.**

12-9-2019
DATE

EDMUND A. SARGUS, JR.
UNITED STATES DISTRICT JUDGE

13